IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RITA DAWN WOERTZ,

        Plaintiff,

        v.                         Civil Action No. 2:10-cv19

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION CLAIMANT'S MOTION FOR SUMMARY
JUDGMENT BE DENIED**

**I. Introduction**

A.    <u>Background</u>

      Plaintiff, Rita Woertz, (Claimant), filed her Complaint on February 16, 2010, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on May 3,

2010.[2]  Claimant filed her Motion for Summary Judgment on June 21, 2010.[3]  Commissioner

filed his Motion for Summary Judgment on July 21, 2010.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

      2.    <u>Defendant's Brief in Support of His Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 11.

[4] Docket No. 13.

C.      Recommendation

        For the following reasons, I recommend that:

        1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ
properly evaluated the treating physician's reports, correctly assessed Claimant's credibility, and
correctly utilized the vocational expert.

        2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same
reasons.

## II. Facts

A.      Procedural History

        Claimant filed an application for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI") on September 25, 2007, alleging disability due to
diabetes, pain in both legs, migraine headaches, blurred vision, increased heart rate, numbness in
the fingers, fatigue, troubled breathing, nerve damage in both legs, high cholesterol, and
depression with an onset date of September 14, 2007. (Tr. 131-43, 169).  The application was
initially denied on January 3, 2008, and on reconsideration on March 10, 2008. (Tr. 82-91, 96-
98).  Claimant requested a hearing before an Administrative Law Judge ("ALJ") on April 30,
2008, and received a hearing on June 9, 2009, in Morgantown, West Virginia. (Tr. 28-77)

        On July 1, 2009, the ALJ issued an adverse decision to Claimant finding that the severity
of her impairments did not meet or medically equal one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926). (Tr. 15-22).
Claimant requested review by the Appeals Council on July 17, 2009, but such review was denied
on December 14, 2009. (Tr. 1-3, 5).  Claimant filed this action, which proceeded as set forth

above, having exhausted her administrative remedies.

B.     Personal History

Claimant was born on June 18, 1962, and was forty-five (45) years old on the onset date

of the alleged disability and forty-seven (47) years old as of the date of the ALJ's decision. (Tr.

131). Under the regulations, Claimant was considered a "younger person" aged 45-49, and

generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work."

20 C.F.R. §§ 404.1563©, 416.963© (2010).  Claimant completed high school and has prior work

experience as a deli, cafeteria and bakery worker, a dishwasher, a cashier, and as a waitress.  (Tr.

41, 170, 176).

C.     Medical History

The following medical history is relevant to the issues of whether substantial evidence

supports the ALJ's finding that the Claimant could perform a range of sedentary work as well as

the ALJ's credibility determination relative to the Claimant:

**Charles Smith, DO, John Manchin, Sr. HealthCare Center, Office Treatment Records,
09/03/1998-07/03/2008 (318-38)**
09.03.98
-Complains of having dizzy spells this morning while lying in bed
-lungs clear; TMs ok
-dizziness - absent symptoms
-No nausea or allergy or asthma

09.10.98
-Pt. to lab for lipid panel

09.11.98
-Note results of lab, but couldn't get a hold of patient

09.17.98
-Came in for lab results today

10.22.98

-Patient has desire to lose weight, nutrition services
-Was put on 1200 calorie diet, encouraged to eat 3 substantial meals/day & include appropriate snacks
-Physical activity includes: walking a mile, whatever aerobic exercises she can do 3x/week

11.15.00
-B/P: 136/74

01.09.01
-(Illegible)

02.05.02
-Complains of cough, chest hurting, dizziness, vomiting
-Prescription: fluids; rest

02.08.02
-Complains of cough, sore throat & tongue, ears hurting, head & chest congestion
-Cough, yellow mucus, fever, some nausea, (illegible)

02.13.02
-Patient states she had allergic reaction to medicine given on 2.8.02 & went to FGH ER
-Objective: vitals noted; chest tight but clear; heart regular rhythm
Assessment: drug reaction, penicillin
-Plan: Dexycycline 100 mg

08.22.02
-BP 130/80

11.02.02
-Follow-up visit for weight reduction diet
-Experiencing some weight loss but not on regular basis
-Given nutrition hand-out materials for reading on weight reduction

06.17.03
-Complains of upper back pain five times a day
-On the 13th, she was picking up a box & developed acute back pain w/some radiating into gluteus; It has persisted but is improving.
-Diagnosis: Subacute back pain
-Rx: light duty slip rest of week, heat, etc.

11.25.03
-Complains of chest congestion & cough
-Objective: vitals noted; maxillary sinuses tender; nasal mucous (illegible) and swollen; chest wheezing

-Assessment: sinusitis
-Plan: medication; increase fluids

<u>12.19.03</u>
-Complains of congestion, breast & pelvic pain
-Objective: vitals noted; TM clear; nasal mucous; chest clear
-Analysis: viral influenza, advised to go to ER if high temperature
-Plan: Symptomatic care, advise to ER if high temperature

<u>12.21.04</u>
-Foot bothering her, hurts, hard to walk on in a.m.
-Has mole on right side of leg which is growing (Movable benign lesion on lower leg)
-Plan: OTC NSAID, ice, stretches

<u>12.30.04</u>
-Complains of right foot pain; pain worse
-Consider apply for nutrition clamp

<u>05.05.05</u>
-Had some sharp chest pains
-Complains of dizziness, rapid pulse, & heart pain
-Patient states: "Haven't been feeling very good."
-Objective: vitals notes; weight gain; chest clear; heart regular rhythm
-Assessment: illegible
-Plan: illegible, patient in for chest X-Rays

<u>05.25.05</u>
-Patient to lab for CBC, (illegible), glucose, thyroid, hepatia, renal & lipid panels

<u>05.27.05</u>
-Lipids up, needs to watch diet closer

<u>06.02.05</u>
-Phone call to discuss lab results

<u>07.06.05</u>
-(illegible)

<u>01.10.06</u>
-Complains of sore muscles, neck & back pain, increased temp, productive cough twice a day
-Assessment: Sinusitis; viral URI
-Plan: Proscribed Dexycycline 100 mg, BID Water

<u>04.06.06</u>

-Complains of painful periods, & aches

04.26.06
-No show

05.11.06
-No show

06.02.06
-(Illegible)

06.05.06
-Here for follow-up from tests at FGH
-Flu, had tests done
-Had pain & diarrhea

06.28.06
-No show

08.04.06
-Nutrition note
-Patient to start on weight reduction diet
-Instructed on 1500 calorie diet so as to lose 1-2lbs/week until she achieves an IBW of 120-140lbs

02.13.07
-Complains of UTI symptoms for 3 days
-U/A & IP done, return check on 2/15/2007

03.27.07
-Cough, cold chills, sneezing, sore through & left earache for 3 days
-Objective: vitals notes; TMs ok, maxillary sinuses tender; nasal mucosa; throat blisters; chest clear
-Analysis: URI sinusitis
-Proscribed amoxicillin 500 mgs, increase liquids or decongestant

04.02.08
-BP: 128/97
-Objective: Heart Rate regular, Lungs-CTA
-Assessment: Blood sugar has been elevated
-Proscribed: Janerica 100 mg, Cymbalta 30 mgs, Diflucan 150 mg
-Claimant will return for BCCSP exam & labs

07.03.2008

-Cytologic Interpretation: Negative for intra-epithelial lesion or malignancy
-Satisfactory evaluation: endocervical component is present
-Heart palpitations, high blood pressure, & circulatory problems reported
-Bilateral Fibrocystic changes, will proceed with routine screening mammogram
-No radiographic evidence of malignancy

**Dr. Thankh-ha Pham, M.D., Office Treatment Records, 03/15/2007 to 2/11/2009 (Tr. 273-301)**

<u>03.15.07</u>
-Chief Complaint: New Patient
-HPI: Feet hurt when walk, feels tired all the time, burning & itching; Heart: RRR; Patient in no apparent distress
-Plan: illegible

<u>04.11.07</u>
-Check up visit
-HPI: Feels better since last visit
-Plan: No change in Meds, allergy, FMH, Social, HX, Health Maintenance from 03.15.07

<u>05.09.07</u>
-Chief Complaint: Leg pain, Right arm numbness
-HPI: numbness started two days ago
-A/P: leg pain (illegible), dizziness (illegible)

<u>06.27.07</u>
-Chief Cmplt: Sick
-HPI: coughing, ST-coworker had walking pneumonia, In PM gets worse, started 3 days ago, sore throat
-A/P: illegible; increased blood pressure- medication (illegible)

<u>07.11.07</u>
-Chief Cmplt: Follow up visit
-HPI: Illegible ROS
-A/P: DM, (illegible); (illegible)

<u>10.09.07</u>
-Chief Cmplt: 3 months
-HPI: Doesn't sleep well, anxious, anxiety, tired
-A/P: Increased BP (illegible), Anxiety (illegible), HFN (illegible)

<u>11.08.07</u>
-Chief Cmplt: 1 month
-HPI: BP, RFC 3 months
-A/P: Gave Claimant sample of Lexapro, Benecar & Lipitor; Wrote Rx for Lyrica free trial

02.13.08
-Chief Cmplt: 3 Month
-HPI: Right knee pain, says heart beat felt "racing," palpitations at rest & w/exercise; Denies CP
-A/P: DM (illegible), right knee pain (illegible), neuropathy (Lyrica), HTM, palpitations
(illegible); Gave sample of Lipitor 40 mg (1 box)

04.03.08
-Chief Cmplt: hands-burning sensation, feet swelling throughout the day w/burning sensation
-HPI: Denies CP, SOB
-A/P: Gave 3 boxes of Lyrica 50 mg

06.18.08
-Chief Cmplt: Check up
-HPI: CR up, FS 200's, will schedule diabetes testing; Denies CP, SOB
-A/P: DM Diabetes, HFM (illegible) (illegible); Gave patient 2 boxes Lipitor 80 mg, 4 Lexapro
10 mg, 4 boxes Lipitor 40, 5 Benicar 20 mg

09.16.08
-Claimant: OU/ R53M

11.13.08
-Chief Cmplt: OU/forms
-HPI: Patient has appt w/ Dr. for injection 12/08; Back pain (illegible), peripheral (illegible)
-A/P: Given 8 boxes Benicar 20 mg, 2 boxes Lipitor 80 mgs, 4 packs Lipitor 40 mg, 8 boxes
Lexipro, 6 bottles Lyric 75 mgs

02.11.09
-Chief Cmplt: OU/R53M
-A/P: PTC x App

**Dr. Tina Yost, Vocational Analysis: Psychological Evaluation, 11/27/2007 (Tr. 213-215)**
11.27.07
-Chief Cmplts:
        *"sick...really bad pain," and seeking benefits "mainly, for the physical."
-Mental Status Examination
        *Appearance: 5'5" and weighs 342 lbs; uses cane; grooming adequate
        *Attitude/Behavior: appears somewhat less forthcoming when providing information
        regarding her daily activities
                -claimant's health most of her life is "pretty good."
                -claimant provides "vague" answers when evaluator inquires regarding her
                activities completed when claimant's leg does not hurt.
                -"initial response is somewhat evasive" regarding when claimant last visited her
                mother

-Social: within normal limits
-Speech: Delivered in normal tones; clear; general ability to communicate is adequate
-Orientation: Oriented to person, place, date and time
-Mood: Somewhat depressed
-Affect: Full
-Thought Processes & Content: No abnormalities evidenced
-No perceptual abnormalities evidenced nor reported by Claimant
-Insight: Low average
-Judgment: Low average
-Suicidal/Homicidal ideation: Denied
-Immediate memory: Mildly deficient; level of concentration seems less than full
-Recent memory: Mildly deficient
-Remote memory: Within normal limits
-Concentration: Within normal limits
-Psychomotor behavior: uses cane; gait is slow
-Diagnosis:
    \*Axis I: 307.89 Pain Disorder Associated w/both psychological factors & a general
    medical condition
    \*Axis II: V71.09 No Diagnosis
    \*Axis III: Diabetic Polyneuropathy, Self-Report
-Prognosis: Fair
-Capability: Evidence suggests claimant is competent to manage her finances


**Dr. Joseph A. Shaver, Psychiatric Review Technique, 12/03/2007 (Tr. 216-29)**
<u>12.03.07</u>
-Medical disposition: Impairments not sever
-Categories upon which medical disposition is based:
    \*12.04 affective disorders, a medically determinable impairment is present that does not
    precisely satisfy the diagnostic criteria above: depressive d/o, NOS
    \*12.07 somatoform disorders, a medically determinable impairment is present that does
    not precisely satisfy the diagnostic criteria above: pain d/o with both psych factors and
    general medical condition
-Functional Limitations:
    \*Restriction of activities of daily living: moderate
    \*Difficulties in maintaining social functioning: mild
    \*Difficulties in maintaining concentration, persistence, or pace: mild
    \*Episodes of decompensation, each of extended duration: none
-C criteria: evidence does not establish presence of C criteria
-Notes: Claimant appears to be generally credible regarding her reported mental functioning.
Significant limitations in Claimant's ADLs seem to be secondary to her physical condition. It is
believed that Claimant possesses the mental capacity to maintain gainful employment on a
sustained basis.

**Dr. Ihab Y. Labatia, WV Disability Examination, 12/13/2007 (Tr. 230-35)**
12.13.07
-Chief Cmplt:
  *Diabetes mellitus, diabetic peripheral neuropathy with bilateral leg and feet numbness and pain, impaired vision, palpitations and shortness of breath with walking, generalized fatigue
-Physical Examination:
  *Claimant denies any neck or back pain
  *Heart rhythm is regular & tachycardia got worse w/ambulation & exertion
  *Used cane for ambulation though not prescribed
  *Does not appear to be in any acute pain/distress
  *No JVD or enlarged lymph nodes; lower extremities show no swelling or tenderness in calves and legs; no calf tenderness, warmth, or redness
  *Neurological exam showed diffusely diminished pinprick sensation in all dermatomes in all 4 extremities
  *Motor exam was difficult to assess secondary to generalized lethargy and weakness although she has at least strength of 4/5 in all muscle groups of 4 extremities; gait showed normal heel to toe walking; complained of palpitations during gait testing
-Assessment:
  *Exam shows generalized weakness with no specific muscle group effect; diffusely diminished pinprick sensations with no specific dermatomal distribution; uses a straight cane for ambulation; tachycardic today although her heart rhythm is regular

**Dr. Porfirio Pascasio, Physical Residual Functional Capacity Assessment, 12/26/2007 (Tr. 236-43)**
12.26.07
-Primary Diagnosis:
  *DM w/peripheral neuropathy/HBP
-Secondary Diagnosis:
  *Tachycardia/obesity
-Exertional Limitations:
  *Occasionally lift: 20 lbs
  *Frequently lift: 10 lbs
  *Stand and/or walk (with normal breaks) for a total of: about 6 hrs in an 8-hr workday
  *Sit (with normal breaks) for a total of: about 6 hrs in an 8-hr workday
  *Push and/or pull (including operation of hand and/or foot controls): unlimited
-Postural Limitations:
  *Climbing ramps/stairs: occasionally
  *Climbing ladder/rope/scaffolds: never
  *Balancing: occasionally
  *Stooping: occasionally
  *Kneeling: occasionally
  *Crouching: occasionally
  *Crawling: occasionally

-Manipulative Limitations:
     \*None
-Visual Limitations:
     \*None
-Communicative Limitations:
     \*None
-Environmental Limitations:
     \*Extreme cold: avoid concentrated exposure
     \*Extreme heat: avoid concentrated exposure
     \*Wetness: unlimited
     \*Humidity: unlimited
     \*Noise: unlimited
     \*Vibration: unlimited
     \*Fumes, odors, dusts, gases, poor ventilation: unlimited
     \*Hazards: avoid concentrated exposure
-Symptoms:
     \*Some allegations not supported by med. evidence therefore she is only partially credible

-Regarding symptoms alleged, Dr. states "some allegations are not supported by medical evidence therefore she is only partially credible."
-Claimant has strength of 4/5 in all muscle groups of four extremities
-Gait showed normal heel to toe walking
-Vision showed less than 20/100 w/ use of Claimant's eye glasses


**Dr. Michael Angotti, Holter Report, 02/18/2008 (Tr. 244-46)**
-Chief Cmplt: claimant examined for palpitations
-Dr. found a normal sinus rhythm at max & min hear rate
-No PVC, Gurlett, V-Tach, Pauses

**Dr. G. David Allen, Vocational Analysis, 03/04/2008 (Tr. 247)**
-Dr. reviewed all pertinent evidence & affirmed assessment completed on 12/03/07

**Cindy Osborne, D.O., Vocational Analysis, 03/07/2008 (Tr. 248)**
-Reviewed all pertinent medical evidence & affirmed assessment completed on 12/26/07
**Michele Carpenter, Vocational Analysis, 03/10/2008 (Tr. 200)**
-Agrees with initial vocational analysis, Claimant is capable of performing past work


**MedPlus Health Care, Office Notes, Labs, EKG, 09/29/2008 to 01/08/2009 (Tr. 253-262, 272)**
09.29.08, Dana Satterfield, CRNP
-Subjective:
     \*New patient; complicated; multiple problems including out of control Type 2 diabetes, dyslipidemia, hypertension out of control, neuropathy, depression, obesity, complaining

of palpitations, diabetic since 2002; appears to have leg discrepancy (right is longer than left leg); does not smoke or drink; eyes hurt with shooting pain; back pain, legs hurt and give out on her, feet hurt, burning neuropathic pain, hands hurt, knees hurt, rapid heartbeat, short of breath, depression

-Objective:
    *Fundoscopic exam is normal; TMS clear, Pharnyx clear
    *Family & social history strong for diabetes, heart disease, hypertension, dyslipidemia
    *NECK: supple without any JVD or bruises
    *HEART: regular rate & rhythm
    *LUNGS: clear
    *ABDOMEN: benign
    *EXTREMITIES: showed no edema.
    *Neurologic is intact
    *BP: 150/90

-Diagnosis:
    *Will put claimant on generic medications, need to get her weight manageable so put on modified south beach diet
    *Follow up visit will include consultation to do something about leg discrepancy

10.09.08
-Subjective: Follow-up for pain and Blood pressure
-Objective: BP: 130/80; Feet turn purple, cold
-Plan: MRI LS spine

10.23.08
-Follow-up & MRI results
-BP: 130/82

01.08.09
-Subjective: morbid obesity with co-morbidities of dyslipidemia, diabetes, hypertension, fatigue, neuropathy; ambulates with cane, secondary to lumbar disc disease; needs surgery; bilateral spondylitis with spondylolisthesis at L5-S1 causing moderate foraminal stenosis; needs a spinal fusion; needs bilater L5 nerve block and cannot afford that; uninsured
-Plan: send to psychologist to help her deal with depression; get some weight off to get better control of blood sugar; see back in 2 weeks

**Dr. Mark A. Hackney, Fairmont General Hospital, MRI spine, 10/17/2008 (Tr. 249-251)**
-Procedure: Lumbar spine without contrast
-Reason for Exam: Lumbar Disc Disease
-Diagnosis: grade 2 anterior listhesis of L5 on S1 with bilateral spondylolysis & fact DJD
-Degenerative signal changes are present at vertebral body endplates at this level
-Other intervertebral discs are within normal limits

**Dr. James Weinstein, Letter to Dr. Kevin M. Clark, 10/23/2008 to 11/03/2008 (Tr. 264-266)**

10.23.08
-Examination showed decrease in reflexes, which probably goes along with diabetes and no obvious focal deficits
-Claimant troubled with diabetes, hypertension & chronic low back problems
-Diagnosis: bilateral spondylolysis at L5-S1 causing moderate foraminal stenosis
-Needs spinal fusion for relief but surgery difficult due to obesity, diabetes & hypertension

**Dr. Richard A. Douglas, New Patient Office Consultation, 12/02/2008 (Tr. 302-05)**
-Review of Systems:
    *Psychiatric: No history of depression or treatment of psychiatric disease
    *Cardiopulmonary: No dyspnea, chest pain, pleurisy or cough
    *Gastrointestinal: No nausea, vomiting, weight loss, constipation or abdominal pain
    *Renal: No dysuria, hematuria, nocturia, urgency or frequency
    *Musculoskeletal: No complaint of unstable gait or arm weakness
    *Neurological: No history of syncope, dizziness, memory changes, disorientation, tinnitus, decreased hearing, diplopia or decreased visual acuity
-Physical Exam:
    *No complaint of unstable gait or arm weakness
    *Constitutional: well-developed; well-nourished; obese; no acute distress
    *Musculoskeletal: Straight leg raising is negative at 90 degrees bilaterally w/negative internal & external rotation of the femur
-Neurological Exam:
    *Mental status: higher integrative functions of orientation to time, person, and place; recent and remote memory, attention span and concentration, language and fund of knowledge were all normal
    *Motor Exam: 5/5 motor strength in all major muscle groups of lower extremities bilaterally; No atrophy or fasciculations.
    *Sensory: unable to distinguish pinprick in her legs bilaterally
    *Deep Tendon Reflexes: 2+ 7 symmetrical throughout the bilateral lower extremities w/the exception of 1+ in the bilateral Achilles. She has downgoing toes. No clonus. Negative Babinski.
-Diagnosis/Plan:
    *Has grade I spondylolisthesis of L5 on S1 secondary to bilateral spondyloysis
    *Dr. encouraged weight loss for low back pain & overall health, return to clinic as needed

**Dr. James D. Colson, Pain Clinic Outpatient Procedure 12/18/2008 -04/21/2009 (Tr. 306-17)**
12.22.08
-Chief Cmplt: Onset of pain was 1 year ago; constant pain in back up to shoulders, legs butt; arms go numb; Burning sensation in Legs & back; Numbness/tingling, trouble sleeping and muscle spasms; Migraines
-A/P: Lumbar spondylolisthesis & moderate foramina stenosis; Facet DID LESI L5/S1 level; Fexcril

<u>03.17.09</u>
-Preoperative Diagnosis: Lumbar spondylolisthesis L5-S1 & lumbar spondylosis
-Performed lumbar epidural steroid injection at the L5-S1 level
-Postoperative diagnosis: Lumbar spondylolisthesis L5-S1 & lumbar spondylosis

<u>04.07.09</u>
-Chief Cmplt: Chronic low back pain
-No pain relief from LESI on 3/17/09
-Claimant is on Lyrica 75 g, BID + Hydrocodone
-Treatment plan: LESI #2 and medication refills

<u>04.21.09</u>
--Preoperative Diagnosis: Lumbar spondylolisthesis L5-S1 & lumbar spondylosis
-Performed lumbar epidural steroid injection
-Postoperative Diagnosis: Lumbar spondylolisthesis, lumbar spondylosis

**Dr. Syed Haq, Office Treatment Records, 04/02/2009 to 04/18/2009 (Tr. 339-42)**
<u>04.02.09</u>
-Chief Cmplt: New patient for diabetes
-HPI:
> *DM2 for 2 years
> *HTM: Well controlled
> *Vision blurred, back pain
> *No chest pain
> *Heart: RRR S1 S2 without mummers, thrills, rubs; normal pulses

-A/P: Counseled to lose weight, Diet & exercise

<u>04.16.09</u>
-Chief Cmplt: 2 week follow-up for DM
-HPI:
> *dM2, Metformin 1000 mg bid,
> *Levemir 20 in PM, 15 in PM,
> *HTN: well controlled

-A/P: Diabetes Uncomplicated Type II Uncontrolled; Hyperlipidemia OT/Unspec; Hypertension
-Hyperlipidemia: No changes

**Dr. P. Kent Thrush, Office Treatment Records, 05/13/2009 (Tr. 343)**
-Bilateral knee pain, some signs of early arthritis but not bad for her age & weight
-Pulse is normal; sensation is normal; reflexes are normal; skin is clear; normal strength of hip flexion, hip extension, hip abduction, hip adduction, knee flexion, knee extension, ankle dorsi-flexion, ankle plantar flexion, and extensor hallucis longus
-Pivot shift & Lachman test is negative
-Range of motion of 3-100 in both knees
-Has chronic back pain with Grade I spondylolisthesis of L5 on S1

-Has normal reflexes & strength in lower extremities
-Goal:
       \*Needs to lose weight, but difficult because of diabetes & insulin
       \*Has degenerative arthritis & degenerative disc disease & spondylolisthesis at L5-S1-
       source of chronic back pain

**Michelle Wetzel, Hamner Psychological Services, Initial Assessment, 05/15/2009 (Tr. 344)**
-Diagnostic impression:
       1. Axis I: 296.22-Major depressive disorder, single episode, moderate
       2. Axis II: V71.09-No diagnosis
       3. Axis III: Self-reported back & leg pain, arthritis, & diabetes
       4. Axis IV: Occupational Problems, financial problems
       5. Axis V: GAF-60

**Dr. Kevin M. Clark, Medical Records, Med Plus Health Care, 07/14/2009-10/13/2009 (Tr. 373-89)**
07.14.09
-Subjective: Follow up
-Objective: curious about weight loss surgery, did not get disability; Spinal deformity, walker or cane to ambulate
-Assessment: grade 1 spondylosis L5-S1, DJD; neuroforminal narrowing; MRI; (illegible); non-compliance -Needs to get serious about weight loss; needs to be on diet for 1 year for Bariatric surgery
-Plan:Walk 30 minutes three times a day, B12 injection, refill on lortab

08.27.09
-Subjective: 1 month follow-up for weight loss & diabetes; complains of really bad shakes & chest pains, also getting SOB, needs medication refills
-Objective: spinal deformity -walks with cane; Diet of 1500 ADA - no sugar or white flour, walking, chest pain, shakes, SOB
-Assessment: Obesity, LDD-needs surgery but weight loss first, chest pain, DM, asthma
-Plan: B12

09.29.09
-Subjective: complains of chest heaviness, numbness in left arm
-Objective: irregular CV; spinal deformity
-Assessment: HTN, peripheral neuropathy, A-fib (new onset), DMII (uncontrolled), DDD, dyslipidemia
-Plan: ASA 325 mg II tabs, Blood sugar 347 at 4:30pm, called 911 transported to FGH ER squad

10.05.09
-Subjective: patient wanted heart beat checked b/c was in hospital for irregular heart beat
-Objective: (illegible)
-Assessment: (illegible); HTN, DM

-Plans: Records from FGH

10.09.09
-Subjective: follow-up for irregular heart beat, has SOB today, some lower back pain yesterday; complained of flu still?
-Objective: irregular CV, Pain, spinal deformity in musculoskeletal & lowered ROM
-Assessment: (illegible); DM; HTN
-Plan: advised to take ½ extra (illegible)

10.10.09
-Subjective: complained of f/u on chest pain, "felt like heart was beating fast last night,"
-Objective: Fatigued, Irregular CV, Sinus tachy, Sugars staying high
-Assessment: Heart rate at 56 apical, if palpitations return advised to ER; Fatigue, dyslipidemia, DJD, a fib, DMII, HTN
-Plan: Proscribed Coumadin 10 mg today then 7.5 mg until Monday

10.13.09
-Subjective; A f.b. RVR
-Objective: Irregular CV, skin rash, chronic pain, Stiffness & swelling, Skin sores
-Assessment: Blood sugar out of control, will deal once C/V study
-Plan: medication

**Nabil Sha Messiah, PA, UHA Pain Clinic Medical Records, 09/28/09 (Tr. 392-395)**
-Subjective: complains of back pain; claimant still has same LBP, not much improvement with meds or injection; claimant requested to repeat LESI as it was useful
-Objective: normal range of motion, no respiratory distress, she has normal mood & affect, behavior, judgment & thought content are normal
-A/P: Positive for back pain, negative for myalgias, neck pain, joint pain & falls; DDD-lumbar; lumbar spondylosis

**Emergency Room Records, Fairmont General Hospital, Records, 09/29/09  (Tr. 345-372)**
09.29.09
-Transthoracic Echocardiogram
        *Interpretation Summary: Left ventricular systolic function is normal; mild concentric left ventricular hypertrophy
-Presentation:
        *Sent from Dr. Clark's office w/ c/o chest heaviness & numbness in left arm
        *Triage assessment: appears in no apparent distress; denies exertional pain
-Examination:
        *Reports chest pain that is located primarily in the substernal area; started 3 days ago; pain does not radiate; no movement of pain; shortness of breath; chest pain is described as dull; intermittent episodes
        *Symptoms are alleviated & aggravated by nothing

16

*Neuro: awake & alert with orientation to person, place and time; behavior, mood & affect are within normal limits
*Chest/Axilla: normal chest wall appearance & motion; no lesions appreciated
*Cardiovascular: rate-tachycardic; rhythm-irregularly irregular
*Respiratory: no signs of respiratory distress; respirations = normal
*Full, normal range of motion
*Left ventricle: grossly normal size; mild concentric left ventricular hypertrophy but systolic function is normal
*Right ventricle: normal in size & function
*Tricuspid, aortic & pulmonic valves are not well visualized
-Disposition:
*Critical care; condition is stable, patient has not experienced similar symptoms in the past
*Symptoms have improved
*Review of systems: some chest pain with palpitations; no dyspnea; back pain; some numbness in the legs
-Plan/Diagnosis:
*Atrial fibrillation w/rapid ventricular response
*Get cardio consult and do a stress test
-Chest Portable:
*Reason for exam: admission
*Impression: negative portable exam of chest

D.    Testimonial Evidence

Testimony was taken at the hearing held on June 9, 2009.  The following portions of the

testimony are relevant to the disposition of the case:

ALJ    Please raise your right hand, Mr. Ganoe; I'll swear you both.  All right, tell me your birthday.
CLMT        6/18/1962.

(The claimant, RITA DAWN WOERTZ, having been first duly sworn, testifies as follows:)

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:
Q    So on the 18th of this month you're going to be 47?
A    Yes.
                            *                    *                    *
Q    Okay.  So how tall are you?
A    I'm 5'4".
Q    Now, sometimes weight is an issue in a disability case.
     What do you weigh?

17

A      I weigh 245.  I did weigh 250.

Q      You've lost a little bit?

A      Some, yeah.

Q      What's normal working weight for you?  Is that average for you?

A      Average, yeah.

Q      Yeah.  And do you have a reason that you want me to know for - -

A      Well - -

Q      - - have you been losing, you said you lost about five pounds?

A      I think stress, actually.  And my nerves are bad.  Just general - -

Q      Are you married?

A      Yes, sir.

Q      Do you have any children?

A      Two.

Q      How old are they?

A      Jonathan is 19 and Alexis is 17.

                *              *                  *

Q      Do you have a driver's license?

A      Yes, I do.

Q      Is it West Virginia?

A      Yes, sir.

Q      Are you able to drive?

A      Not all the time.  My vision goes blurry and I almost wrecked three times.

Q      Well, has a doctor said you need to surrender your license?

A      No, sir.

Q      Do you have any restrictions on your license?

A      No, sir.

Q      Okay.  How did you get to the hearing this morning in Morgantown?

A      My husband brought me.

Q      Did he drive?

A      Yes, sir.

Q      Do you have an opinion as to how long it took you to get here from your home?

A      Half hour maybe.

Q      Did you have any problems this morning, physical problems or mental or discomfort or anything?

A      Yes, pain, discomfort.

Q      Okay.  Did you graduate from high school?

A      Yes, sir.

Q      Can you read?

A      Yes, sir.

Q      Can you write?

A      Yes, sir.

Q      Can you do simple arithmetic?

A      Some.

Q      Did you have any special training after you graduated?

| | |
|---|---|
| A | No, sir. |
| Q | Did you go back to school for any reason? |
| A | No, sir. |
| Q | Okay.  You said you were fired from Wal-Mart - - |
| A | Yes. |
| Q | - - and got sick - - |
| A | Yes. |
| Q | - - in September of '07. |
| A | Yes, sir. |
| Q | Was that the last day you worked? |
| A | Yes, sir. |
| Q | Have you worked at any job after that date to the present for cash? |
| A | No, sir.  No, sir. |
| Q | Under the table? |
| A | No, sir. |
| Q | Volunteer work? |
| A | No, sir. |
| Q | Okay.  So September of '07 is your last job? |
| A | Right, sir.  Yes, sir. |
| Q | And you were working at Wal-Mart? |
| A | Yes, sir. |
| Q | How long did you work at Wal-Mart?  How many years?  Best of - - |
| A | About six years there and I worked at Food Land for 11 years. |
| Q | Well, let's take them one at a time. |
| A | Okay, all right. |
| Q | What were you hired to do at Wal-Mart? |
| A | Well, I first was hired, I was in the cafeteria and then they switched me to the deli but in the cafeteria you had to lift heavy soda, you know, in tanks. |
| Q | Yeah. |
| A | And you had to adjust them and they were really, really heavy and you know, had to clean. |
| Q | So you had an eating area in your Wal-Mart - - |
| A | Yes, sir. |
| Q | - - that you worked in - - |
| A | Yes. |
| Q | - - and people could buy food from you? |
| A | Yes. |
| Q | And you kept the food and served it - - |
| A | Right.  And then - - |
| Q | But you were behind a counter, weren't you? |
| A | Yes, sir. |
| Q | And you weren't a cashier, were you? |
| A | No, not at first. |
| Q | At the cafeteria? |

| | |
|---|---|
| A | Well, no, they didn't have a cash register there. |
| Q | How did you pay? |
| A | Everything was scanned. |
| Q | All scanned? |
| A | Yes. |
| Q | Okay.  Did you prepare food? |
| A | Yes, sir. |
| Q | You cooked, too? |
| A | Yes, sir. |
| Q | Okay. |
| A | Deep fryer and you had to clean up the fryer. |
| Q | Okay.  And then how many, when did they shift you over to the deli? |
| A | It was about my sixth year. |
| Q | The last, the very last - - |
| A | Yeah, the very last two years. |
| Q | - - you were at the deli? |
| A | Yes, sir. |
| Q | What was the difference between the cafeteria and the deli for you and the work you did? |
| A | Well, you had to clean the slicers.  You had to do a lot of lifting, unloading heavy chicken boxes. |
| Q | Cheese? |
| A | Cheese.  You had to clean.  I wasn't a lazy person; I did my job. |
| Q | Which job was the heaviest, cafeteria or deli, or about the same? |
| A | Deli. |
| Q | Deli was the heaviest? |
| A | Yes. |
| Q | Okay.  And that's the job you were doing when you left? |
| A | Yes, sir. |
| Q | And you said - - |
| A | Actually, they were probably about the same because - - |
| Q | Yeah. |
| A | - - you know, the soda tanks that you had to lift. |
| Q | Same as the bag, box of frozen chicken or something? |
| A | Yes, uh-huh.  And then I had to unload the truck. |
| Q | Can you take me back to the job you did before Wal-Mart?  Do you know what that one would be? |
| A | Food Land. |
| Q | What was it? |
| A | Food Land. |
| Q | Food Land? |
| A | Uh-huh. |
| Q | What were you, deli? |
| A | Deli and bakery we was at, we had to do. |

Q        How long did you work at Food Land, ma'am?

A        Eleven years.

Q        So which was the heaviest, the deli or the bakery?

A        On the Food Land?

Q        Yes.  In terms of what you had to do, in terms of your duties, lifting.

A        The deli was.

Q        And how was that 11years?  Did you split the work or did you do so many years in the deli, so many years in the bakery?

A        No, it's combination.

Q        You worked it all.

A        Right, yeah.  Because at that time, if someone come down to the bakery and they needed donuts, you know, then you had to work both positions.

Q        Were you a cashier?

A        No, not there.

Q        All right.  So you got 11 years at the Food Land and six years, is there any work left that takes us back to  15?

A        I worked at Sweet Williams.

Q        What is that?

A        That is a restaurant.  I was a waitress there.

Q        Okay.  That was in the 80s?

A        Yes, sir.

Q        I'm not going to count that.

A        Oh, okay.

Q        But I see some, did you work at a university?

A        Yes, I did.

Q        Where did you work?

A        I worked in the cafeteria.

Q        Where was that, Fairmont?

A        WVU.

Q        You worked there from '96, '93 to '96 or something like that?

A        I think I was only there for a year.

Q        '96.

A        Yeah.

Q        So it didn't last very long?

A        No.

Q        Okay.

A        I was having problems then, too.

Q        And then, I don't know where I got this.  The department store is Wal-Mart - -

A        Yes, sir.

Q        - - that you worked in the deli.

A        Yes, sir.

Q        So I didn't really understand that but you did try to work in the cafeteria at WVU -

A        Yes.

| | |
|---|---|
| Q | - - in the student center - - |
| A | Right, yes, sir. |
| Q | - - for one year? |
| A | Uh-huh. |
| Q | And what were you doing there just in case it becomes important in the 90s? |
| A | Preparing the patients' food. |
| Q | Were you at the hospital? |
| A | Yes. |
| Q | I'm sorry. I thought you said the Mountain Lair. |
| A | No, it's the - - |
| Q | So you're Ruby? |
| A | Yes. |
| Q | Okay. |
| A | I, we prepared the food for the patients and baby bottles and also we had to do the dishes. Whatever needed done, we had to do. |
| Q | The hospital cafeteria? |
| A | Yes, uh-huh. |
| Q | All right. And the heaviest part of that work for you? |
| A | I think it was the dishes and - - |
| Q | Clean up, clean up. |
| A | - - the cleaning up, yes. |
| Q | Dishwashing and things like that? |
| A | Wet floors. |
| Q | Does that adequately represent your work history then for 15 years? |
| A | Yes. |
| Q | All right. Now, can you tell me what is your worst mental or physical condition? What causes you the most problem? I'm going to list them all is what I'd like to do - - |
| A | Uh-huh. |
| Q | - - and then we'll talk about them. |
| A | Okay. I think it's - - |
| Q | What's your worst problem? |
| A | My worst problem is my mental, my health, actually. |
| Q | Well, I know that, but let's talk about - - |
| A | My back. |
| Q | Your back? |
| A | My back, my legs. I have numbness in my legs. My feet burns and itch and my hands, they go numb on me. And I'm just, I don't know. |
| Q | All right. What causes this? First of all , are you a diabetic? |
| A | Yes, sir. Very bad diabetic. |
| Q | Do you take shots? |
| A | Yes, sir. |
| Q | And how long have you been a diabetic? |
| A | Two year, maybe three. |

Q       Well, you signed up in '07.

A       Yes, sir.

Q       So were you a diabetic then?

A       Yes, sir.

Q       All right.  Now, you said your back.  Do you know, can you tell me what you understand your back problem to be?

A       I'm  in pain constantly.

Q       Well, do you know what it is?  I mean, do you know what you have wrong with your back that causes the pain from your examinations and testing that you had?

A       I think my back is really messed up and it needs surgery.

Q       Have you had any back surgery?

A       No, sir.

Q       Why not?

A       Well, they told me because of my weight.

Q       So the doctor says he can't operate on you because you're overweight?

A       My weight, my blood pressure is high and I'm in constant pain.

Q       Well, mainly you, you know, the doctor did say that your weight, your blood pressure, and your diabetes - -

A       Diabetes.

Q       - - precluded surgery.

A       Yes, sir.

Q       And you'd have to lose what, 100 pounds - -

A       Yes.

Q       - - before he would even consider doing the surgery?

A       Yes, sir.

Q       And this was Dr. Weinstein down in Clarksburg or Fairmont, -

A       Yes, sir.

Q       And you saw him and talked to him about that?

A       Yes, sir.

Q       Okay.  And did you, did they tell you you needed bariatric surgery, maybe a stomach bypass or some type of stapling or - -

A       Yes.

Q       - - lap band surgery, but you can't get it, right?

A       Right.

Q       Why?  You don't have insurance?

A       I don't have, well, I just recently got a medical card and I did ask Dana Centerfield about it.

Q       It won't cover it?

A       I don't think it will, yes.

Q       So, but that's just to help you lose weight, right?

A       Right.

Q       You can't do it any other way?

A       No.

Q   And then you have feet and leg numbness and things like that?
A   Yes, sir.
Q   Now, are you seeing a psychiatrist or a psychologist - -
A   Yes.
Q   - - for a mental condition?
A   Yes, sir.
Q   What is your mental condition?  You haven't told me about that yet.
A   I think it's stress and I can't do the things I used to do and I can't - -
Q   How often do you go for treatment for your nerves?  Where do you go?
A   I go to Pain Center up here on Ruby, I mean up here in Morgantown.
Q   For your - -
A   My back, back.
Q   - - stress?  But who do you go to - -
A   Psychiatrist?
Q   Or a psychologist.  Do you have one?
A   Hammer, Hammer I go to.
Q   Hammer Psychological or something?
A   Yes, yes, sir.
Q   How often do you go there?
A   Sometimes two times a month.
Q   How long have you been going there?
A   Maybe two months ago.
Q   Is that all?
A   Yes, sir.
Q   Do you take any medicine?
A   Yes, I do.
Q   Are you able to, you know, this is a long list of medicines.
A   Yes, sir.
Q   Most of them are the diabetes medicine.
A   Yes, sir.
Q   Then some are the blood pressure and water pill.
A   Right.
Q   And then you take a cholesterol medicine.
A   Yes, sir.
Q   But there's Cymbalta.
A   Yes, sir.
Q   Do you still take that?
A   Yes, sir.
Q   And then you said you take some pain medicine.
A   Yes, sir.
Q   Tramadol and - -
A   Yes, sir.
Q   Do you have any other pain medicine?
A   Lap band or hydro - -

Q I was trying to find - -
A Yeah, hydro.  I can't pronounce it but it's Lortab.
Q Hydro.
A It's a generic brand.
Q Hydrocodone?
A Yes, un-huh.
Q That's pretty strong stuff.
A Yes, sir.
Q And who gives you all this?
A Dr. Fan was helping me with that.
Q And who helps you now?
A Dr. Satterfield.
Q And where is he?
A She's at the - -
Q She.
A - - Meplas [phonetic] Center.
Q Is she your treating doctor?
A Yes, sir.
Q How often do you see her?
A Two times a week usually.
Q And your pain is mostly in your back and legs?
A Yes, sir.  In my feet too, also, and my hands.  They go numb on me.
Q You don't use a cane?
A Yes, I do.
Q Did you come in with a cane today?
A Yes, sir.
Q Who prescribed a cane?
A My legs was hurting me so bad when I was falling that I just, you know, I bought me one.  It's just, I was having so much problems with my legs and falling, I needed a stable, you know, to stable myself.
Q Do you get any injections in your back?
A Yes, sir.
Q Who does those?
A Pain Center up here in Morgantown.
Q Any physical therapy?  Did you ever go?
A No, sir.
Q What aggravates your pain?  Can you give me some idea of what makes it worse?
A Stress, my diabetes, my legs hurt me so bad.  They go numb on me.  My feet.  My feet burns and itch.
Q All right.  Do you get any help from your medications?
A They help some.
Q Do they cause you any side effects?
A No, sir.
Q Scale from zero to 10; 10 being the worse, rate your pain for me now.

A      Ten.

Q      So you don't get any help at all from your medicines?

A      No, but sometimes - -

Q      Did you take any of them this morning?

A      Yes, sir.

Q      What did you take this morning?

A      I took a Lortab and my diabetes.

Q      But no pain medicine?

A      I took pain medicine.

Q      Which one, Lortab?

A      Lortab, un-huh.

Q      And that's all?

A      I also took my high blood pressure and Lyrica for my feet.

Q      Didn't' lower your pain?

A      It helped some but not really.  I think it's stress.

Q      You got at 10 and 10 is really bad.

A      Yes, sir.

Q      Ten is the worst pain you could have.  You probably wouldn't be even able to sit here today.

A      Well, it's just, I don't know.  I'm in - -

Q      Okay.  How far can you walk or how long can you walk on level ground?

A      I would say 15 minutes.

Q      Standing in one place, how long?

A      Ten minutes and I'd have to sit down and rest.

Q      Can you bend your knees and  squat?

A      Some, but not very well.

Q      Can you bend forward at the waist?

A      Some.

Q      Right or left handed?

A       Right.

Q      Any problems with your hands?

A      Yes.

Q      Make a fist for me with both of your hands.    Any problem?

A      They hurt.

Q      Well, can you close your fists and do they feel like you  have some grip?

A      No.

Q      You hold your cane.  What happens when you hold your - -

A      I hold my right hand.

Q      Okay.  How about your left?  Any problem?

A      My left, I mean, you know.

Q      If you lay your hands on a hot stove, would you know it?

A      Yes.

Q      What do you lift on a routine basis?

A      Maybe five pounds.

| | |
|---|---|
| Q | Now, sitting. |
| A | Uh-huh. |
| Q | How long can you sit comfortably? |
| A | I would say 15, 20 minutes. |
| Q | Do you have problems with your memory? |
| A | Yes. |
| Q | Describe the problem. |
| A | My memory, it fades.  I can't - - |
| Q | Fades? |
| A | Yeah.  I can't remember a lot of things. |
| Q | How about TV?  Can you follow a program on TV? |
| A | Some, but it's like I get, I just, I'm not, I like to sit down and watch a little bit of TV but not very long. |
| Q | Do you have problems with crowds? |
| A | Yes. |
| Q | How many make you uncomfortable?  How many people? |
| A | I would say probably 10. |
| Q | Do you have any breathing difficulties? |
| A | Yes, sir. |
| Q | What makes it worse? |
| A | More heartbeat, beats  really fast when I walk.  Pain.  I'm in pain. |
| Q | Do you smoke? |
| A | No, sir. |

*           *           *

| | |
|---|---|
| Q | What do you get in terms of help from the state?  Do you get any benefits? |
| A | Food stamps.  A medical card.  Help pay for my medicine. |
| Q | Okay.  Do you get, and of course, your husband works? |
| A | Yes, sir. |
| Q | Okay.  How many hours a night do you average sleep? |
| A | Maybe six, seven. |
| Q | Describe your night for me.  Do you sleep straight through? |
| A | Sometimes, not all the time. |
| Q | So what happens when you don't sleep through?  How do you - - |
| A | I might just sit down, try to relax a little bit. |
| Q | Do you get up? |
| A | Yes, sir. |
| Q | Can you take care of your personal hygiene, bathe, dress, wash your hair and things like that without any help? |
| A | My husband helps me. |
| Q | All the time? |
| A | Yes, sir. |
| Q | What does he help you do? |
| A | He helps me wash my hair and wash my back for me. |
| Q | What about cooking? |

A       He does the cooking.
Q       All of it?
A       Yes, sir.
Q       What about when he's working?  How do you eat, then?  What do you do?
A       He packs me a lunch.
Q       Before he leaves?
A       Yes, sir.
Q       You can't make a sandwich or something like that?
A       No, he packs me my lunch and puts in a zip bag.
Q       Okay.  What time are you out of bed typically in the mornings?
A       Seven.
Q       What will you do?
A       I get up and my husband has my medicine ready for me and he makes my
        breakfast.   And then I'll go back to bed and then I can't sleep, sometimes I sleep
        because I'm depressed.
Q       Well, what will you do through the day?  I mean, what - -
A       I get up, maybe watch a little bit of TV.
Q       Any of your children at home - -
A       Yes, sir.
Q       - - during the day?
A       Yes, my son is.
Q       All right.  Does he do anything or do you - -
A       He helps me.
Q       Do you do any chores?
A       No, sir.
Q       You don't dust or run a vacuum - -
A       No.
Q       - - or do the dishes or anything?
A       No, sir.
Q       Why?
A       My hands hurt me and my legs.  I'm in pain constantly.
Q       Who does the laundry?
A       My husband.
Q       You don't do any laundry?
A       No.
Q       Do you go to the market?
A       No, sir.
Q       No grocery shop at all?
A       No, my husband does it.
Q       Do you have any hobbies or activities?
A       No, sir.
Q       You don't have a garden?
A       No.
Q       Don't have any pets?

| | |
|---|---|
| A | No. |
| Q | No flowers or anything? |
| A | No. |
| Q | Do you go to church? |
| A | No, sir. |
| Q | Do you attend meetings? |
| A | No, sir. |
| Q | What have you given up?  What did you used to do that you don't do now when you worked? |
| A | I would say life, actually.  I'm depressed and I'm in pain. |
| Q | Well, I can't - - |
| A | My legs hurt me so bad.  I'm depressed. |
| Q | Well, you've said that quite a bit. |
| A | Yeah. |
| Q | But I only see where you went to Hammer Psychological one time.  So for somebody that's depressed, it would seem to me that you would be in a hospital. |
| A | I was in a hospital. |
| Q | For mental health treatment? |
| A | No, sir. |
| Q | Well, what were you in the hospital for? |
| A | My sugar. |
| Q | Okay, but let's talk about depressed. |
| A | Uh-huh. |
| Q | When were you hospitalized for your depression? |
| A | I went there because I was feeling depressed and stressed, actually, lift.  I can't, I cry constantly.  I can't do - - |
| Q | But you don't go to therapy? |
| A | No. |
| Q | You don't see a psychologist or a psychiatrist on a regular basis? |
| A | I have seen them. |
| Q | I'm looking at your medical records. |
| A | Uh-huh.  I, it took me a long time to realize I needed help.  It really did.  I mean, I didn't want to believe that I needed help and, I don't know.  Sometimes I just, you know, I just couldn't put myself out there seeing I needed help. |
| Q | Okay.  Your home, is it one level? |
| A | No, sir. |
| Q | Two stories? |
| A | Two story. |
| Q | Bedroom is on the second floor? |
| A | Bedrooms on the first floor and the second floor. |
| Q | And the washer and dryer in the basement? |
| A | Yes, sir. |
| Q | Okay.  All right. |

*   *   *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q    Why did your job end?
A    Because I was in pain and I was having headaches.  My sugar, my legs was hurting me and I couldn't do the work anymore that I could do.   I was - -
Q    So, were you missing work?
A    Yes, I was missing - -
Q    How much?
A    A good bit.
Q    What's that mean?  Let's say in an average month, if you could say?
A    Twenty days maybe or 15.  I don't know.  It's just - --
Q    How long was that happening, missing that much work?  I mean, you worked there for what, six years?
A    Yes, uh-huh.
Q    So when did you start missing such excessive numbers?  About what point in time?
A    When I started getting sick.  My health was going down and I couldn't do the job anymore.  I was getting really - -
Q    So was that about a year before, what?
A    Yeah, I would say about a year before because I couldn't do the job.  I had to lift heavy - -
Q    Uh-huh.
A    - - chicken rotisseries.
Q    So did they let you go?
A    Yeah, they fired me.
Q    Okay.  Now, are you seeing a counselor now for your mental health?
A    Psychiatrist, yes.
Q    Counselor.
A    Yes.
Q    And is that at Hammer Psychological Services?
A    Yes.
Q    And how many times have you been there?
A    I would say four times.
Q    And how did it come about that you started going there?
A    I needed help.  I realized that I really did need help.  I was putting it off - -
Q    Uh-huh.
A    - - and it came about that I needed help because my stress and my mental condition, my health.  I can't, I couldn't do it the things I used to do.
Q    What keeps you from, let's say, you know, your personal needs.  You said your husband washes your hair and helps - -
A    Yes.
Q    - - you with that type of thing.  Why can't you do it?  What stops you?
A    Pain.  I'm in pain and my hands, they go numb and my legs, they go numb and tingle.  My feet hurts.  And that's why he has to help me.

30

Q       And why are you not able to do any cooking?

A       Because I can't do it anymore.

Q       Because of what conditions?  I mean, what's stopping you from standing over a sink and washing a few dishes?

A       Pain, my diabetes.  I have pain going up and down my legs and my feet, they burn and itch.  And I take medicine for that, Lyrica for that.

Q       Do you know what's causing that, what condition?

A       My diabetes.

Q       As far as your diabetes, how long have you been on insulin?

A       I'd say probably about two months now.

Q       Who put you on it?

A       Dr. Hawk.

Q       Why?

A       Because he knows my sugar has gone up and it was uncontrollable.  Even though I would eat what I'm supposed to eat and try to diet.

Q       Are you on anything, you're taking insulin and pills?

A       Yes, un-huh.

Q       Do you take anything else other than the Lyrica for your diabetes?

A       I take FlexPen and metformin.

Q       Okay, what's the FlexPen for?

A       For my sugar, insulin.

Q       How often do you use that?

A       Two times a day, morning and afternoon.

Q       Why do you use that?

A       Because of my diabetes.

Q       Why was  that prescribed in addition to all these other medications?

A       Because my sugar was uncontrollable, I mean - -

Q       How long have you been on the FlexPen?

A       Maybe three months because my doctor referred me.  Dr. Satterfield referred me to Hawk.  Because I was having problems.  My eyes was hurting me.  And my sugar was - -

Q       How are you doing now with the sugar control?

A       It's about the same.

                    *               *             *

Q       With the pain that you're describing - -

A       Uh-huh.

Q       - - if you could say where your pain is the most, what area would you say?

A       I would say my back and my legs and my hands, my feet.

Q       So you really couldn't put one before the other, it's just –

A       No.  The culmination of all.

Q       This numbness in your hands, what does it keep you from, if anything, what does it keep you from doing?

A       Lifting, cooking.

Q       What about writing?

A      I have a hard time writing because they go numb in my hands.

Q      What if you were using like a keyboard?

A      They still go numb.

Q      There was some history of migraines.

A      Yes.

Q      Tell me about those.

A      I was having really, really bad migraine headaches.

Q      Are you having them now?

A      Yes.

Q      How often?

A      Two times a week at least.

Q      How do they come on?

A      Just, they just come right on.  I don't know if it's stress or culmination of my health  like.

Q      Uh-huh.  How long do they last?

A      It varies.

Q      From?

A      An hour, two hours.

Q      What do you usually do?

A      I take Tylenol.  Sometimes my pain medicine will help, too.

Q      Okay.  Do you lie down during the day?

A      Yes, I take naps and I try to lay down and rest.

Q      How much time do you spend doing that in a typical day?

A      I try to do it at least two times a day.

Q      For how long?

A      At least a half hour until I wake up.  Until I wake up.

Q      Why do you do that?

A      Because I'm in so much pain and my legs, they go numb on me and my feet burns and itch.

Q      How would you rate your concentration?

A      Not very well.

Q      Why is that?

A      Because my mind goes blank sometimes.

Q      Were you having any concentration problems at your last job?

A      Yes, I was.

Q      And what kind of problems, if any, did that cause?

A      Mentally?

Q      Yeah.

A      I had a hard time thinking and just couldn't concentrate on my job.

Q      Did you make any mistakes?

A      Sometimes, yes.

Q      Okay.  The epidural shot that you had, was that just recently in your back?

A      Yes, my back.

Q      Did you have any benefit from that?

| | |
|---|---|
| A | No. |
| Q | Are you supposed to have any more? |
| A | I have to go back tomorrow, actually. |
| Q | Is there anything else about your physical or mental condition that you'd like to add? |
| A | My heart beat beats rapidly. |
| Q | Okay. How does that affect you when that happens? Are you aware of it? |
| A | Yes, I'm very aware of it and just like I have to sit down, relax and it just beats so fast, it takes my breath away sometimes. I can even be sitting down outside or something and I felt like it was my last breath. I thought, oh my God, you know, I thought I was going to die. It's just, I have a hard time breathing and my heart beat beats rapidly. |
| Q | Okay. |

*      *      *

E.     <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- is able to read, write, and do basic math (Tr. 41)
- can sit comfortably for 15-20 minutes (Tr. 58)
- has problems with her memory (Tr. 58)
- likes to sit down and watch television but not for long periods of time (Tr. 58)
- feels uncomfortable in crowds (Tr. 58)
- has breathing difficulties (Tr. 58)
- can no longer work (Tr. 161)
- can no longer cook (Tr. 60, 161, 162)
- sleeps 6-7 hours each night; sometimes sleeps straight through the night (Tr. 59)
- has trouble sleeping due to numbness in feet, pain in legs, and body jerks (Tr. 161)
- is able to dress herself but needs help putting on socks and shoes (Tr. 161)
- showers at times but most of the time washes off with a cloth because she cannot stand or sit for a period of time (Tr. 161)
- needs assistance washing her hair because she cannot keep her arms up for a long period of time (Tr. 60, 161)
- needs assistance shaving (Tr. 161)
- hand shakes while eating (Tr. 161)
- does not need any reminders to care for personal hygiene (Tr. 162)
- does not need reminders to take her medicine (Tr. 162)

- does not prepare her own meals (Tr. 162)
- is unable to do chores (Tr. 61, 162)
- only goes outside when she has doctor appointments (Tr. 163)
- when she does go out, she cannot go out alone (Tr. 163)
- has a license but does not drive (Tr. 40, 163)
- does not shop but has family shop for her (Tr. 61, 163)
- is able to count change (Tr. 163)
- is unable to pay bills, handle a savings account, and use a checkbook/money order (Tr. 163)
- does not have any hobbies (Tr. 61, 164)
- does not spend time with others (Tr. 164)
- does not go anywhere on a regular basis (Tr. 164)
- has problems getting along with others because she is depressed (Tr. 165)
- can walk 10-15 minutes before needing a rest (Tr. 56, 165)
- is unable to follow written instructions (Tr. 165)
- does not follow spoken instructions very well because she cannot comprehend (Tr. 165)
- has been fired/laid off from a job because of sickness (Tr. 166)
- does not handle stress well (Tr. 166)
- numerous references in the record to Claimant's obesity

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence because he misread a CE report generated by social security evaluator, Dr. Yost.  Claimant also argues that the ALJ's decision must fail because his credibility analysis was improper under SSR 96-7p and because he failed to address Claimant's pain.

Commissioner contends that substantial evidence supports the ALJ's decision because the ALJ properly evaluated the opinion evidence from Drs. Yost and Shaver in accordance with controlling regulations and because the ALJ applied the correct legal standards in determining Claimant's credibility.  Commissioner also argues that the ALJ's RFC assessment and hypothetical posed to the vocational expert were sufficient to permit the ALJ's determination that the Plaintiff was not disabled within the meaning of the Act because Claimant could perform a range of sedentary

work.

B.    <u>Discussion</u>

### 1. Whether the ALJ Properly Evaluated the Treating Physician, Dr. Yost's, Report In Compliance With the Controlling Regulations

Claimant argues that the ALJ's decision was in error because he misstated Dr. Yost's opinion by stating that Claimant "was or could be exaggerating her symptoms," when Claimant argues the opinion is "silent" as to exaggeration and credibility. Claimant continues her argument by contending that the ALJ failed to consider the Psychiatric Review Technique prepared by a Social Security doctor who determined that the "Claimant appears to be generally credible."

Commissioner argues that the ALJ properly evaluated Dr. Yost's opinion in accordance with controlling regulations. Commissioner contends that the ALJ's finding that Claimant was exaggerating her symptoms was reasonable after a review of the consulting psychologist's report. In her report, Dr. Yost "noted that Claimant reported no history of mental treatment (Tr. 213), reported a decrease in her depression symptoms due to taking an antidepressant prescribed by her physician one year earlier (Tr. 213), denied visiting family, but also reported regular contact with her family (Tr. 214), was vague in answering the psychologist's questions (Tr. 214) and was 'somewhat less than forthcoming when providing information regarding her daily activities.'" (Tr. 214). Commissioner highlights that the "ALJ stressed the fact that Plaintiff did not seek treatment for her allegedly disabling depression until May of 2009, nearly two years after her alleged onset of disability." (Tr. 15, 20). Commissioner lastly argues that there is no merit to Claimant's argument that the ALJ ignored the opinion evidence from state agency expert Dr. Shaver.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(2) (2010). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 f.2d 1012, 1015 (4th Cir. 1984).

Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). To decide whether the impairment is adequately

supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Affording controlling weight to Dr. Yost's opinion is inappropriate in this case because the ALJ found the opinion to be inconsistent with other substantial evidence in the case record. Claimant argues that because Dr. Yost's evaluation is "absolutely silent" as to Dr. Yost's opinion on exaggeration or credibility, that the ALJ misstated the report by concluding Claimant was exaggerating her symptoms. The report, however, is replete with substantial evidence to the contrary. Specifically, while Claimant was initially evaluated by psychologists who concluded that Claimant had no more than moderate limitations, Claimant failed to seek formal treatment for her mental complaints. Additionally, the ALJ found it noteworthy that the Claimant did not seek treatment for her allegedly disabling depression until May 2009, which was nearly two years after her alleged onset of disability. (Tr. 15, 20). Therefore, the Court finds that the ALJ was acting reasonably in evaluating and affording less than controlling weight to Dr. Yost's opinion due to its discrepancies with the objective medical evidence.

Claimant also mistakenly argues that the ALJ did not consider the Psychiatric Review Technique prepared by state agency expert, Dr. Shaver. The ALJ, however, expressly stated that he "considered the opinions of the State Agency medical consultants who evaluated [Claimant] at the initial and reconsideration levels of appeal, and finds that these opinions were reasonable and well-supported by the objective medical signs and findings." (Tr. 21). The Court finds this argument without merit.

**2. Whether Substantial Evidence Supports a Finding that Claimant's Subjective Symptoms Were Not Entirely Credible**

Claimant argues that the ALJ's finding is not supported by substantial evidence because the ALJ erred in his credibility assessment. Specifically, Claimant alleges that the ALJ failed to complete a proper credibility analysis by departing from SSR 96-7p and by failing to address Claimant's pain. Claimant contends that though the ALJ states he considered the Claimant's obesity in determining her residual functional capacity ("RFC"), "he does not state how he considered it and what about it he actually considered." Additionally, Claimant argues that the ALJ does not provide a comprehensive credibility finding by failing to state which symptoms and complaints he believes and those which he does not.

Commissioner argues that the ALJ applied the correct legal standards in accordance with the SSR 96-7p factors in determining that he could not credit Claimant's statements concerning her symptoms. In particular, Commissioner asserts that the ALJ identified, evaluated Claimant's statements under the relevant rulings and regulations, and then explained why the legal standards prevented him from fully crediting Claimant's statements.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no

disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  The ALJ must next "expressly consider" whether a claimant has such an impairment."  Id. at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.

The regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529© and 416.929© (2010).

Accompanying factors are provided in SSR 96-7p that the adjudicator must also consider in addition to the objective medical evidence when assessing the credibility of an individual's statements. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant's argument regarding the ALJ's credibility determination must fail. Claimant contends that "the ALJ did not even do the slightest analysis of credibility required by SSR 96-7p" but avoids specifically stating instances of how the ALJ did not follow the proper procedure. Contrary to Claimant's assertion, the record illustrates that the ALJ evaluated Claimant's symptoms in accordance with the two-part test in Craig and the SSR 96-7p factors. Under Craig, the ALJ first found that "Claimant's medically determinable impairments could reasonably be

expected to cause the alleged symptoms; however, the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 19-20). Second, the ALJ "expressly" considered whether Claimant "has such an impairment" by devoting three pages of analysis to explain his reasoning supporting his finding. (Tr. 18-21).

In accordance with the factors set forth in SSR 96-7p, the ALJ examined the objective medical evidence, Claimant's daily activities, Claimant's work history, and Claimant's statements concerning the limiting effects of her symptoms. First, the ALJ examined Claimant's diabetes and determined that while "the evidence indicates that she has had difficulty controlling her diabetes, she has not experienced repeated episodes of acidosis, nor has she required ER visits...due to elevated blood sugars." (Tr. 20). In fact, the ALJ notes that Dr. Haq reported that Claimant's diabetic control was improving. (Tr. 20).

The ALJ next discussed Claimant's back impairment and obesity and found that Claimant would be limited to performing sedentary work. (Tr. 20). The ALJ notes Dr. Thrush's assessment that Claimant had normal strength, pulses, sensation and reflexes on May 13, 2009 and further recommended that Claimant perform light walking exercises. The ALJ inferred from Dr. Thrush's report that his recommendations indicated that Claimant was capable of performing some standing and walking. (Tr. 20).

The ALJ's report then examined Claimant's tachycardia finding that while Dr. Labatia's examination revealed Claimant had some mild tachycardia upon exertion, Claimant's other medical records consistently indicated that her pulse was within normal limits. (Tr. 20). Relative to Claimant's alleged migraine headaches, the ALJ found no mention of this problem in

Claimant's medical records and noted Claimant's testimony that her headaches "respond well to medication." (Tr. 20).

Regarding Claimant's vision problems, the ALJ found Claimant's hearing testimony and medical records to be conflicting stating, "it is interesting to note that the Claimant testified...that her diabetes was so bad that the eye doctor could not give her glasses, even though Dr. Labatia noted that she wore glasses." (Tr. 20). Also, the ALJ noted that Claimant has not sought, nor does Claimant's medical records indicate, treatment from a specialist for her alleged vision problems. Additionally, Claimant has not been told she cannot drive by any of her doctors. (Tr. 20).

Lastly, the ALJ examined Claimant's mental impairments. The ALJ found the delay in seeking treatment and a denial of any history of depression particularly compelling. The ALJ stressed that Claimant did not seek mental health treatment until May 2009 and denied any history of depression on December 2, 2008, during an evaluation with Dr. Douglas. (Tr. 20). The ALJ also noted that Claimant reported a decrease in her symptoms from taking anti-depressant medications. (Tr. 20). Perhaps more importantly, the ALJ determined that while Claimant would have some limitations due to depression, such impairment would not preclude Claimant from performing all work on a sustained basis. (Tr. 20-21).

Therefore, this Court finds that the ALJ had more than a mere scintilla of evidence and appropriately discredited Claimant's subjective statements regarding her pain and symptoms.

### 3. Whether the ALJ Properly Declined to Rely Upon the Vocational Expert's Testimony

Claimant appears to assert a third argument stating that "the ALJ asked the Vocational Expert (VE) that if Ms. Woertz were to be found to be fully credible, would there be any jobs

that she would be able to do. The VE answered no." Commissioner contends that the ALJ properly declined to rely upon the VE's testimony because the ALJ properly found that the record evidence failed to corroborate Claimant's allegations of totally debilitating pain and symptoms.

The Claimant makes no argument and, without more, this Court cannot speculate as to the contentions Claimant makes. Therefore, this argument must fail.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ properly evaluated the treating physician's reports, correctly assessed Claimant's credibility, and correctly utilized the vocational expert.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 31, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE